[656 NYS2d 2]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ANGEL
ALICEA, Respondent.

First Department, March 27, 1997

### APPEARANCES OF COUNSEL

*Patrick J. Hynes* of counsel *(Mark Dwyer* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

*Kenneth Walsh* for respondent.

### OPINION OF THE COURT

SULLIVAN, J. P.

Since, as the hearing testimony shows, defendant's trial counsel provided him with effective assistance, we reverse the order vacating the judgment of conviction based on a contrary determination by the trial court and reinstate the same.

After a jury trial, defendant was convicted of murder in the second degree and criminal possession of a weapon in the fourth degree and sentenced to concurrent terms of imprisonment of from 17 years to life and one year, respectively. His conviction arose out of an incident that, according to the trial testimony, occurred on October 23, 1988 at about 3:00 A.M. At the time, Stanford Hewitt, James Williams, Sinclair Towe and Clarence Crawford were walking towards the train station on Pitt Street on the Lower East Side on their way to Hewitt's house in Brooklyn to spend the night when they observed defendant, codefendant Michael Rivera,* a dark-skinned Hispanic, and two others walking toward them from the opposite direction. Defendant, wearing a green jacket, and the two others were light-skinned Hispanics. Words were exchanged be-

---

* Rivera was convicted of manslaughter in the first degree and criminal possession of a weapon in the third degree. On appeal, his conviction was reversed and the indictment dismissed for legal insufficiency. Specifically, this Court found the evidence insufficient to establish that Rivera shared a community of purpose with defendant with respect to the homicide victim. *(People v Rivera,* 176 AD2d 510, *lv denied* 79 NY2d 863.)

tween Rivera and Hewitt. At the time, defendant and his companions had nothing in their hands. Rivera, his fist clenched at his side, kept taunting Hewitt, who "[stood] his ground."

. Williams, seeing Rivera take a black-bladed knife from under his shirt, rushed over to his friend Hewitt, placed his arms around him and urged him to leave. Hewitt agreed. Towe, at Hewitt's side, began to walk ahead. After walking about 40 feet, Towe realized that the two others were still at the scene. He turned to see Rivera walk up to defendant and, as the two stood close together, observed Rivera speak to defendant. From the position of their hands, it seemed as though Rivera handed something to defendant. Neither Towe nor Crawford saw an exchange of an object.

Suddenly, as Williams and Hewitt were turning to leave, Rivera, hands by his side, turned around and walked up to Hewitt, who was still being shielded by Williams. Rivera swung over Williams and punched Hewitt. Hewitt grabbed Rivera and the two began fighting. Their struggle took them to the other side of the street. Defendant pulled out a dark-colored knife while one of his two unidentified companions displayed a gun. At one point during their struggle, Rivera was on the ground with Hewitt on top of him.

As Hewitt and Rivera fought, defendant and his armed companion raised their weapons and ran toward them. Defendant held the knife over his head as he approached Williams, trying to separate Hewitt and Rivera. Williams grabbed the gunman, who "motioned like he was shooting the gun", and the two fell to the ground. Eventually, the gunman hit Williams over the head with a heavy object, causing him to bleed. Williams could not see where his assailant went.

As defendant ran toward Williams, he was intercepted by Crawford, who, in trying to grab defendant by the hand, grasped the blade instead. Defendant immediately pulled the blade away, slashing the middle fingers of Crawford's left hand. Raising the knife, defendant ran toward Crawford again, slashing him on the neck and coat. Crawford frustrated the attack by kicking the defendant and causing him to fall. Defendant, however, was soon back on his feet waving the knife back and forth.

Apparently aware at this point that Crawford and Williams were both injured, defendant "backed off" and moved over several yards to where Hewitt was still fighting with Rivera. Crawford, bleeding from the head and hand, and Williams, who

were walking away from the scene, turned and saw defendant and his companions run toward the corner.

Crawford, Williams and Towe heard Hewitt, standing at the curb grabbing his stomach, calling Crawford by his nickname, "Booby". Instead of crossing the street and joining his friends, however, Hewitt collapsed. Rushing to his side, his three companions found Hewitt bleeding profusely from his stomach; Hewitt said nothing; his eyes "just rolled back". Defendant and his friends stopped to watch from the corner and then fled across Houston Street. A little over one minute had elapsed since the incident began. Hewitt died at the scene. An autopsy revealed five cutting injuries, including three superficial cuts to the head and two stab wounds to the body, which were the cause of death. One entered the chest and penetrated the heart; the other entered from the back and penetrated the left lung.

When the police responded, defendant was described to them as light skinned, with no facial hair, five feet seven inches tall, weighing about 135 pounds, with short hair and wearing a green jacket and baseball hat. The police recovered a blood-covered knife at the scene, later identified by Crawford as the one used to attack him moments before Hewitt was stabbed, and followed a trail of "little droppings" of blood from Pitt Street across East Houston Street 2 1/2 blocks and up the steps of the apartment building at 50 Avenue D. The trail continued up the staircase to the sixth floor, apartment 6D.

A search of the apartment, consented to in writing by the occupant of the apartment, codefendant Rivera's mother, uncovered a green jacket, pair of pants and hat. No blood was found on the clothing. The blood on the knife, which failed to reveal any readable fingerprints, was identified as human. Rivera surrendered later that day at the precinct. Defendant, bandaged on the left thumb, was arrested at his home that evening. The police conducted three lineups, which included defendant, Rivera and one other companion and which were viewed separately by Towe, Crawford and Williams. Crawford identified both defendant and Rivera as his assailants. He recognized defendant as the one with the knife that he had grabbed and Rivera as the one who had fought with Hewitt. Williams identified only the gunman. Towe could not identify anyone.

Defendant's conviction was affirmed by this Court and his application for leave to appeal to the Court of Appeals denied. (173 AD2d 397, *lv denied* 78 NY2d 961.) In affirming, this Court rejected defendant's claims, *inter alia*, that the evidence was

insufficient to prove his identity as the killer and that he had been denied the effective assistance of trial counsel.

Defendant subsequently moved, *pro se*, to vacate his conviction, alleging that a police complaint report of an interview with the witness Towe had not been disclosed by the People at trial and constituted *Rosario* as well as *Brady* material. Postjudgment defense counsel filed supplemental papers in support of the motion, repeating the *Rosario/Brady* claim and alleging also that defendant's trial counsel had rendered ineffective assistance if, having received the Towe report, he had not used it to cross-examine Towe. The People maintained that the Towe report had been disclosed and argued that there were possible tactical reasons for the absence of cross-examination based on the report, which, in any event, did not prejudice defendant. After inspecting the entire Police Department file, which had been turned over to him, postjudgment defense counsel claimed that five additional documents, including a complaint report reflecting an interview with the witness Crawford, were also missing from trial counsel's file, raising the inference that they, too, had not been disclosed. Defense counsel requested a hearing, which was ordered.

At the hearing, Police Officer Bellezza testified that he responded to a report of an assault at the corner of Pitt and Stanton Streets. In time he interviewed Hewitt's three companions, Crawford, Williams and Towe. That same morning, he prepared three complaint reports, which reflected his own observations and information gathered from the interviews. The report on the Hewitt attack, based on statements of the witness Towe, contains the assertion that "Perp #1 M/B produced above described weapon [black-handled knife], stabbing victim in right side chest, right shoulder blade in back and (2) slash marks to left neck." The report on the Crawford attack attributed to Mr. Crawford an assertion that "[i]t escalated into with Perp #1 (M/B) producing above knife. Perp then thrust toward victim."

Defendant's trial counsel, whose practice was to maintain complete files, including *Rosario* and *Brady* material, on all past cases and who had moved his office and files since the time of defendant's trial, received a copy of the Towe complaint report three years after the trial from defendant and, on a review of his file, could not find a copy of the report. Two years later, postjudgment counsel sent him copies of the Crawford complaint report as well as the third complaint report prepared by Officer Bellezza; on reviewing his file, trial counsel

could not find a copy of either report. Postjudgment counsel also sent copies of three complaint follow-up reports to trial counsel, who did not find copies of these reports in his file either.

Trial counsel testified that if he had had the Crawford and Towe reports at trial, he "[a]bsolutely" would have used them to cross-examine Crawford, Towe and Bellezza. He was "shocked" when postjudgment counsel showed him the reports and stated flatly that he "never had" the reports before then. On cross-examination, however, when shown a transcript of Officer Bellezza's trial testimony that he had indeed prepared three complaint reports, trial counsel could not remember whether he had the reports at trial. He had to concede, however, that if a witness testified that there were three complaint reports and if those reports had not been disclosed, he would obviously have asked for their production. He was unable to explain why, in such circumstances, he had not asked for their production in this case. Although trial counsel could not recall the names of key witnesses, the facts of the case or any of the details of his trial strategy, he was certain he would have used the Crawford and Towe reports to cross-examine prosecution witnesses because such use is "so basic".

The hearing court found that the three complaint reports prepared by Officer Bellezza on the morning of the murder had been available in the courtroom during the officer's trial testimony. Although the court found that trial counsel had the Crawford and Towe reports, which contained statements suggesting that a black man had stabbed Hewitt, and that counsel would have used the statements had he been aware of them, it determined that he had, in fact, been "unaware" of their significance. Thus, the failure to use the statements was, according to the hearing court, not a deliberate trial tactic but, rather, a result of counsel's unexplained failure to grasp their significance. Although counsel's efforts on defendant's behalf were otherwise "adept", the court held, his failure to use the Crawford and Towe reports was so prejudicial to defendant as to deprive him of effective representation.

At the outset, it should be noted, the record amply supports the hearing court's determination that defendant's trial counsel did, in fact, have the documents in issue at the time of trial. The hearing court erred, however, in vacating the conviction because, as a review of the hearing record shows, defendant failed in two respects to carry his burden of showing ineffective counsel. He did not show the absence of any tactical

reason not to conduct the suggested cross-examination and he failed to show a reasonable probability that the outcome of the trial would have been different if such cross-examination had been conducted.

It hardly need be stated that a defendant has the right to the effective assistance of counsel. To prevail on a claim that he was deprived of such right, a defendant "bears the well-settled, high burden of demonstrating that he was deprived of a fair trial" as a result of counsel's performance. (*People v Hobot*, 84 NY2d 1021, 1022.) An attorney's representation is constitutionally effective unless the evidence, the law and the circumstances of the particular case, viewed in their totality and as of the time of the representation, show that the attorney failed to provide "meaningful representation." (*Supra,* at 1022; *People v Flores*, 84 NY2d 184, 187.) "What constitutes effective assistance is not and cannot be fixed with yardstick precision, but varies according to the unique circumstances of each representation." (*People v Baldi*, 54 NY2d 137, 146.)

Of course, even the most brilliant advocacy will not prevail in the face of compelling evidence of guilt. Thus, " 'trial tactics which terminate unsuccessfully do not automatically indicate ineffectiveness' " (*People v Rivera*, 71 NY2d 705, 708). In their analysis, courts must "avoid both confusing true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis. It is always easy with the advantage of hindsight to point out where trial counsel went awry in strategy." (*People v Baldi, supra*, 54 NY2d, at 146.) Thus, "simple disagreement with strategies and tactics" will not suffice (*People v Rivera, supra*, 71 NY2d, at 709). Indeed, trial counsel's subjective reasoning is not even determinative as long as the record, viewed objectively, "reveal[s] the existence of a trial strategy that might well have been pursued by a reasonably competent attorney." (*People v Satterfield*, 66 NY2d 796, 799.) To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate the "absence of strategic or other legitimate explanations" for counsel's conduct (*People v Rivera, supra*, 71 NY2d, at 709) and overcome the presumption that counsel's performance falls within the wide range of reasonable professional competence (*Strickland v Washington*, 466 US 668, 688-689). Without such a showing, "it will be presumed that counsel acted in a competent manner and exercised professional judgment." (*People v Rivera, supra*, 71 NY2d, at 709.)

In addition to the heavy burden of demonstrating the failure to provide effective assistance under these broad standards, a

defendant is not entitled to vacatur of the conviction unless he or she further shows that the attorney's conduct "prejudice[d] the defense or defendant's right to a fair trial." (*People v Hobot, supra*, 84 NY2d, at 1024.) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v Washington, supra*, 466 US, at 694; *People v Castellano*, 203 AD2d 116, *lv denied* 83 NY2d 965.)

Putting aside for the moment the Crawford and Towe reports, as the trial record demonstrates and as the hearing court found, trial counsel's representation of defendant was "adept". Entering the case at arraignment, he raised *Huntley* and *Wade* issues and successfully moved for a suppression hearing at which he conducted a probing cross-examination of the People's only witness. He made a successful *Sandoval* application and, at trial, insisted on the record that aided cards and hospital records be made available to him so that he could test on cross-examination the credibility of the People's witnesses. He raised the appropriate objections to the prosecutor's questions and offers of evidence and skillfully cross-examined both civilian and police witnesses. At the close of the People's case, he presented a cogent argument for a trial order of dismissal. His summation, although not lengthy, given that it followed that of counsel for codefendant Rivera, emphasized the reasonable doubt standard and impugned the People's evidence of intent to kill. He reminded the jurors that none of the witnesses had actually seen defendant stab Hewitt and that any finding that defendant was the stabber would be purely speculative. At sentencing, he argued that the verdict should be set aside as being unsupported by the evidence and requested the minimum sentence for his client. Thus, a review of the entire record shows that trial counsel was a zealous and effective advocate.

Notwithstanding these efforts, defendant, in support of his postjudgment motion, asserted, and the hearing court found, that trial counsel's representation was constitutionally ineffective because he did not, using police reports, disclosed as *Rosario* material, attributing to both men statements suggesting that a black man was the stabber, impeach Crawford's and Towe's testimony that they did not see who stabbed Hewitt. Defendant failed, however, as noted, to show that trial counsel, who could not recall at the hearing what his trial strategy was, had no tactical reason not to impeach Crawford and Towe with

the complaint report statements. Since defendant never established at the hearing what trial counsel's strategy was, he could hardly show that the omitted cross-examination was inconsistent with that strategy. Trial counsel's testimony that he would have used the statements regardless of his particular strategy because they involved a "basic point" is, of course, speculative and, like his rejected testimony that he never received the reports in issue, suspect as being tailored for litigation. Significantly, defendant's main claim at the hearing was not that he was denied the effective assistance of counsel but, rather, that, based on the nondisclosure of the complaint reports, a *Rosario* violation had occurred. Thus, in asserting that he would "absolutely" have used the reports if he had possessed them, trial counsel was not conceding ineffectiveness on his part, but, instead, was attempting to support the nondisclosure claim. Trial counsel also testified that if he had the reports in issue at the time of trial he would not have overlooked them, especially since there was so little paperwork in the case. To reject that testimony, as the hearing court did, and at the same time accept trial counsel's assertion that there would be no tactical reason not to use the Crawford and Towe statements for cross-examination purposes is, to say the least, inconsistent.

Moreover, in opposing the postjudgment motion, the People posited several acceptable tactical reasons why a competent defense attorney might opt to forgo cross-examination on the basis of the Crawford and Towe statements. Since both witnesses testified that they did not see who stabbed Hewitt, there was little to be gained by introducing a prior inconsistent statement to the effect that the witnesses had seen the stabber. In that regard, the People were not obliged to prove that defendant was the actual stabber since the indictment charged both defendant and Rivera with murder on a theory of acting in concert. Thus, a competent defense attorney could reasonably have decided to reject a strategy of blaming Rivera for the stabbing and disclaiming concerted conduct, choosing instead to emphasize, as trial counsel did, that no one saw the stabbing, that there must have been more than one knife used in the incident and that it would be highly speculative to conclude that either defendant or Rivera had been the stabber.

While trial counsel testified that by using the statements he could have "give[n] the jury the killer", the fact is the jurors would not have been permitted to consider the statements for their truth, that is, as evidence that Rivera had stabbed He-

witt (*see, People v Blanchard*, 177 AD2d 854, *lv denied* 79 NY2d 918; *People v Gilman*, 135 AD2d 951, *lv denied* 71 NY2d 896), and Rivera's counsel surely would have requested a curative charge to that effect, to which his client was entitled (*see, Matter of Millington v New York City Tr. Auth.*, 44 AD2d 542). Of course, even if the jurors impermissibly would have used the impeachment material to conclude that Rivera had been the stabber, trial counsel would still have had to defend against the prosecution's acting-in-concert theory.

On the other hand, using the statements for impeachment purposes was fraught with risk. In their attempts to explain the apparent inconsistencies, the witnesses under cross-examination could well have given testimony that would have had an adverse impact on the defense. Officer Bellezza, for example, may not have understood that "Perp #1 M/B", who "produced" the knife, had handed it over to another perpetrator before the physical altercation began and may have thus assumed that the same perpetrator, number 1, stabbed Hewitt. In explaining that misunderstanding, the witnesses would have necessarily dwelled on the handover, a matter which trial counsel would just as soon have left as murky as possible. In summation, it should be noted, trial counsel argued that there was no evidence that the knife was passed.

Moreover, given that neither complaint report attributes to Crawford or Towe the assertion that the witness had actually seen the stabbing, even if these witnesses had admitted telling Officer Bellezza that they thought Rivera had killed Hewitt, it could easily have been developed on further examination that such an assertion had been a mere assumption on their part, based on the fact that Rivera had been Hewitt's antagonist during the altercation. It would not have been difficult, for instance, to show that there would not have been time for defendant to pass the knife, which obviously was the murder weapon, to the struggling Rivera before the stabbing occurred. An exploration of this chain of events before the jury could only have served to fortify the conclusion that defendant, and not Rivera, was the stabber. Thus, since the record, viewed objectively, "reveal[s] the existence of a trial strategy that might well have been pursued by a reasonably competent attorney", trial counsel's subjective, after-the-fact reasons for forgoing a cross-examination based on the complaint report statements are immaterial. (*People v Satterfield, supra*, 66 NY2d, at 799.)

Nor, even assuming that there was no tactical reason to refrain from using these statements on cross-examination, does

this record yield the conclusion that defendant was so prejudiced by the purported omission that he was deprived of the legal representation guaranteed by the Constitution. Assuming, arguendo, that the omission was the result of incompetence rather than choice, it was not the sort of single error so substantial by counsel, otherwise competent, as seriously to compromise defendant's right to a fair trial.

As already noted, since the prior inconsistent statements would not have been admissible for their truth, they would not have provided evidence showing that Rivera stabbed Hewitt. Moreover, the physical evidence introduced at trial supported the theory that defendant stabbed Hewitt, rendering remote the persuasive impact of the complaint report statements. The serology analysis of the clothing seized from Rivera's apartment showed that no blood was found on Rivera's pants. If Rivera, who, fighting Hewitt at close quarters, had been the one who twice thrust a knife deep into Hewitt's lung and heart, some blood would surely have spurted onto his pants. This evidence far outweighed in probity the complaint report statements as to the stabber's identity.

Finally, viewing the complaint report statements as the hearing court did, that is, as evidence as to the identity of Hewitt's stabber, it would have, in actuality, only strengthened the People's case. Evidence, consistent with the complaint reports, that defendant, after slashing Crawford and running toward Hewitt, had handed the knife back to Rivera so that Rivera could use it to kill Hewitt, although exonerating defendant as the stabber, would clearly have been damning under the acting-in-concert theory.

Accordingly, the order of the Supreme Court, New York County (Michael Obus, J.), entered October 17, 1994, granting defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, rendered September 27, 1989, on the ground of ineffective assistance of counsel, should be reversed, on the law and on the facts, the motion denied and the judgment of conviction reinstated.

Motion seeking to relieve counsel is withdrawn.

ROSENBERGER, NARDELLI, RUBIN and WILLIAMS, JJ., concur.

Order, Supreme Court, New York County, entered October 17, 1994, reversed, on the law and on the facts, the CPL 440.10 motion denied, and the judgment of conviction reinstated. Motion seeking to relieve counsel is withdrawn.